# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

PHILLIP WHITE,

                                Plaintiff,

                -vs-                            DECISION and ORDER

EASTMAN KODAK,                                 06-CV-6493-CJS

                                Defendant.

---

## APPEARANCES

For Plaintiff:                    Christina A. Agola, Esq.
                                  2100 First Federal Plaza
                                  28 East Main Street
                                  Rochester , NY 14614
                                  (585) 262-3320

For Defendant:                 Marion Blankopf, Esq.
                                  Nixon Peabody LLP
                                  Clinton Square
                                  P.O. Box 31051
                                  Rochester , NY 14603
                                  (585) 263-1000

## INTRODUCTION

This is an action for retaliation brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, 42 U.S.C. § 1981 and the New York State Human Rights Law. The matter is before the Court on a motion for summary judgment (Docket No. 36) filed by Eastman Kodak ("Kodak"). For the reasons stated below, the application is granted.

**FACTUAL BACKGROUND**

Except where otherwise indicated, the following relevant facts are undisputed and taken from the parties' submissions pursuant to W.D.N.Y. Local Rule of Civil Procedure 56.1.[1] Philip White ("White"), who is a black African-American male, born on July 21, 1952, was hired by Kodak in 1973 and was terminated on August 17, 2006. In November 2001, he was transferred to Kodak's Service Marketing Operations group ("SMO") and assigned the position of Account Management Representative ("AMR"). At the time of his transfer, White was a paygrade K8, the level at which he was kept by Kodak, although the paygrade of starting AMRs was only K4 (the full range being K4 to K8 in this group). The SMO group had about 40 AMRs. From October 2003 until June 2004, White's supervisor in the SMO was Thomas Broderick ("Broderick"). Then, from June 2004 through August 2006, his supervisor was Christine Gage ("Gage"). When she was on maternity leave in August 2005 through February 2006, Deborah Latta ("Latta") supervised him. At all times relevant to this lawsuit, the SMO group had three other black African-American employees, all of whom were female. (Gage Reply Aff. ¶ 6.)

---

[1]As was the case in *Guarino v. St. John Fisher College*, No. 06-CV-6251-CJS, 2008 WL 850333 (W.D.N.Y. Mar 28, 2008), *vacated on reconsideration by Guarino v. St. John Fisher College*, 553 F. Supp. 2d 252, 233 Ed. Law Rep. 705 (W.D.N.Y. Apr 16, 2008), Christina A. Agola, Esq., thwarted the purpose of W.D.N.Y. Local Rule of Civil Procedure 56.1 by filing an 89-page response to Kodak's 20-page statement of facts, instead of filing a "a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Further, throughout her response to Kodak's statement of facts, Ms. Agola, by way of opposition, often repeated wholesale, and sometimes verbatim, the arguments made in her memorandum of law. As the Court did in *Guarino*, the Court has disregarded the opposition when it is irrelevant to the facts asserted by Kodak and clearly not contradicted.

White's job as an AMR was to communicate with customers of Kodak concerning renewal of their service contracts with the company. White, and the other AMRs, were assigned customers based on geographic districts around the country. White's routine job activities included speaking with customer and processing billing, accounting and service information into Kodak's computerized customer billing and invoice system called the ESS system.

Since White, at the time of his transfer, was new to AMR position, Kodak, as was its custom, allowed him three years in the position before evaluating him against the expectations of a K8 paygrade AMR. This allowed him to retain the salary and benefits he had prior to his transfer. Thus, in the first year, Kodak rated White against the performance standards of a K4 paygrade, then K6 in his second year, then a combination of K6 and K8 in his third year. Finally, in 2005, he was expected to meet all the requirements of a K8 paygrade AMR. His first Employee Performance Assessment took place in 2002 and was a development rating, in which it was noted that he could improve by staying focused on his work, completing the backlog of data entries and improving his knowledge of policies and procedures. In 2003, rated against the K6 standards, White was found to meet them.

In 2004, however, White received an Employee Performance Assessment noting "Results Met Some; Not All Objectives." (Gage Aff., Ex. B.) Gage reported that after White finished his special assignment on the 91 Day Report[2] at mid-year, he maintained a low

---

[2]The information technology department at Kodak creates the 91 Day Report on a weekly basis and distributes it to all the AMRs on Monday. It lists customers that Kodak formerly serviced through a distributor. Ninety days after the customer contracts with the distributor lapse, Kodak is permitted to bid for the customer's business directly. AMRs are expected to contact the customers who are in their geographic location and on the 91 Day Report and quote a price for a service
(continued...)

productivity for the remainder of the year. She also noted that he took only one-third the average number of calls of other AMRs and was not able to independently resolve complex issues, a requirement of the higher paygrade AMR ratings.

In 2005, the first year White was rated against the higher K8 standards, he again received an Employee Performance Assessment noting "Results Met Some; Not All Objectives." (Gage Aff., Ex. D.) The assessment further noted that White had made mistakes in processing credits and invoices and that other AMRs complained that he was taking excessive lunch hours and breaks, making long personal phone calls, and, at the same time, was asking them for assistance in covering his workload. Latta had prepared the performance assessment and showed it to Gage when the latter returned from maternity leave. Gage agreed with it, and, in May 2006, both supervisors showed it to White. White strongly disagreed with the 2005 performance evaluation. When Gage tried to counsel him with regard to leaving work for long periods without notifying her, White sent her an email accused her of threatening him and hanging "punitive mandates" over his head. The full contents of that email message are as follows:

> Today you approached me regarding advising you about a couple of extended lunch hours to attend to my personal health issues or health issues of my mother. I have always tried to advised you of these matters I'm sure you have several examples of emails providing prenotices and make up time also in the form of email usually the following morning. **The attached emails represent such examples**. I've expressly tried to inform you accordingly of such matters. Furthermore, I always try to attend to such matters during my

---

[2](...continued)

agreement. AMRs then make entries in Kodak's database for customer billing and invoicing, the ESS system, to record all their actions in contacting, or attempting to contact, the customer. An AMR's entries into the ESS system are identified by a personal identification number, in White's case it was 008PW.

lunch hour as much as possible. I'm typically at work early approx 30 minutes to an hour early which should account for such matters.

Also, in your absence when I have a need t [sic] leave early I've informed Allen, Tom, Dave, Rita etc of any emergencies. I have no history of any absence problem that I'm aware of. Plus you and I have talked extensively about this matter since you shared your own mother is a diabetic.

You called attention to weds June 1st when I came back later after a lunch hour visit with my mother. Let me say that many **unexpected** issues arrise [sic] when dealing with a elderly senior person who's life is in the balance. This situation is clearly an exception, not the norm.

When doing so I'm not checking my watch every minute to guard against inventory control by management. I've always operated on an honor system. Which is to advise management when and where appropriate. Yet, there are always the unexpected events under these kinds of conditions. One would hope that in the current environment of work life flexibility and FMLA , that employees can have some measure of flexibility without threats such as **this is the last time I'm going to talk to you about this**. I've not disrespected you or anyone for that matter when it comes to dealing with such matters. Nor do I owe Kodak any make up time. Please allow me the flexibility of managing such matters absent of unjustified supervisory pressures.

Let me give you some examples of needed family support for a sick parent: [T]hursday my mother has an appointment at 11:30 AM for heart exam. Monday June 13th she has a appointment for head and neck CT Scan for internal bleeding. She has fallen several times and endured bodily harm. Myself and her doctor are trying to get to the bottom of the dizzy spells and falling incidents. This is vital so she can function and not have to lay in bed or on a couch all ay after having urinating and so on on herself because she is afraid to get up to walk. She is not eating properly creating more problems. She has been to emergency several times over the last two to three months due to diabetic condition. She was admitted last week for three days. She has on going problems with medication we are trying to resolve, and so on.

So a mere personal phone call or two, or an unsuspected extended lunch is the least of my problems. This is yet another episode of supervision being unsympathic [sic] to employee needs, and making hasty determinations with accusations and threats of consequences without first simply talking to people. Yet, even after we talked you still choose to maintain your position

of hanging so called punitive mandates over my head. You mentioned during our meeting that You may start to have this type of discussion with others in the department.

Since I'm the first one I feel even more satisfied. This is just a string of many other incidents that apply to select people in the department. let me say, in the future I will take vacation for such personal needs to avoid this kind of scrutiny. Not a problem.

Starting tomorrow and [F]riday I have lunch hour personal needs. Any time beyond my normal one hour I will take as vacation. Also, I'll let you know upon returning that I've had an unexpected event.

(Phillip White email to Christine M. Gage (Jun. 8, 2005, 5:17 PM), attached to Gage Aff. as Ex. E, at 23 (in the .pdf file) (emphasis in original).)

On November 14, 2005, White filed the first of two charges with the Equal Opportunity Employment Commission ("EEOC"). He alleged that Kodak was discriminating against him on account of race, age and disability. (Blankopf Aff., Ex. C, at Ex. 48.) More specifically, he complained that he had not received any pay raises, or promotions, that he was subject to workplace harassment, and that he was given no accommodation was a carpal tunnel injury. (*Id.*) Kodak filed its response in February 2006 and on July 20, 2006, the EEOC dismissed the complaint as unfounded and issued a right to sue letter, dated July 20, 2006. Subsequently, on October 3, 2006, White commenced the subject action. (Blankopf Aff., Ex. C, at Ex. 50.)

White's job performance did not improve in 2006. In that regard, Gage noted:

I continued to notice the same or similar problems with Mr. White's job performance in the first half of 2006. He not only continued to fall behind in processing data for his districts, but he also continued to make mistakes in the how he processed the data. For example, in Spring 2006, he repeatedly reinstated service contracts retroactively for time periods during which the customer had outstanding invoices for service calls, without performing the

necessary processing to cancel out the outstanding invoice. (*See* e-mails dated 4/28/06 and 5/18/06, attached within Exhibit F.) Left as is, this discrepancy would be flagged by Kodak's auditors as impermissible double-billing by Kodak. In my opinion, this was an obvious and significant failure by Mr. White to comprehend and adhere to basic department policies.

(Gage Aff. ¶ 27.) Rita Root, an Operations Team Leader in the SMO, wrote emails to Gage dated May 18 and May 24, 2006, complaining about White's work. In her May 24th email, she informed Gage that she was,

sitting with Phil [White] every day, due to the fact that I have found so many errors on the credit reports. Here are the two reports. I have gone thru [sic] March. I only briefly look over April (I just got it yesterday), but as you can see there are errors with that month also. I have highlighted them in yellow. When I review these reports with Phil do you what to be there? Examples or the error: Incorrect reason code, Incorrect ins # used, Incorrect ins # for that dollar amount, not following the reinstatement policy. Phil knows (sometimes) to credit out a per call invoice, but doesn't fix the record to prevent that from happening again. These are only a few of the things I found and will be reviewing. I know that this review will take along time, Phil questions everything. I think this review should be soon due to the number of errors.

(Exhibit H.) Gage questioned White about another contract issue, involving another company, in an email dated April 27, 2006. (Gage Aff., Ex. F.) She stated in a reply email to him the following day that, her "concern is that from auditing it is not lawful for us to have a paid service agreement and an outstanding per call on the same AR# within the same time frame." (*Id*.) In his deposition, White, when questioned about the training he received from Root, stated that he was going to adopt only some of the approaches she was telling him to use. (White Dep., at 241.)

Gage also noted that White was not processing carekits[3] on a daily basis, as she required of every AMR. In an email dated May 18, 2006, she told White that carekits had been in his folder since April 17. (Gage Aff., Ex. F.) In her email, she further instructed White to process his carekits by the end of the week. Although White responded that he was working on them, when Gage checked on the carekits the following week, she noted that another AMR had processed White's carekits. (Gage Aff. ¶ 28.)

Additionally, Gage received a complaint from one of White's coworkers that he was out of the office for long periods of time and that she and others had to help him with his workload. This complaint also reported White sleeping at his desk, reading the newspaper, and giving wrong information on the phone. (Gage Aff., Ex. G., at K 10932.)

Since White was not making improvements and had failed to achieve his performance objectives, Gage discussed the situation with Broderick and Senior Human Resources Manager Lisa Wainwright ("Wainwright"). After this discussion, she decided to issue a performance memorandum to White, the first step in the formal counseling process at Kodak. The memorandum contained detailed requirements for White to meet, and set a follow-up review for June 22, 2006. (Gage Aff. ¶ 48.) In that regard, Gage and Wainwright met with White on June 13, 2006, to give him the performance memorandum and to discuss it with him. (Gage Aff., Ex. I.) When informed of the memorandum, White became furious and said that he shouted at Gage several times and called her a liar. He refused to read the memorandum, so Gage read it to him, but she became so upset at

---

[3]"Carekits" are service contracts purchased by the customer through a reseller and the AMRs are responsible for registering the carekits so that if the customer calls Kodak for service, they are not charged a fee. Further, registration of the carekits triggers a rebate check to the resellers. (Gage Aff. ¶ 28.)

White's behavior towards her, she left the meeting and Broderick stepped in. (Gage Aff. ¶ 47.)

Subsequently, before the follow-up meeting scheduled for June 22, 2006, Gage examined White's work records in preparation for the meeting and noticed discrepancies on his 91 Day Report. When reviewing White's ESS system entries, Gage noted that he had entered codes in the database which indicated the he had contacted, or attempted to contact, a large number of customers by telephone on several days during the prior week. Many of the coded entries were "Not Using" (indicating the customer had stopped using a Kodak product) or "Unable to Contact" (indicating the AMR could not contact the customer using the telephone number in the ESS system). As a consequence of entering those codes, the ESS system removed that customer from the following week's 91 Day Report and Kodak would no longer attempt to contact those customers.

Normally, an AMR would transfer their customers on the 91 Day Report to an end-user category and generate written price quotes for new service agreements. When entering codes indicating attempts to contact customers by telephone, or that a customer had stopped using Kodak equipment, White's entries did not reflect any supporting information that would normally accompany such entries. Gage also discovered that for one of the days on which White had listed a large number of phone calls, he had been in meetings most of that day and could not have had the time to make a high number of calls.

Gage brought her findings to Broderick and Wainwright, who agreed that further investigation was needed. They were concerned that if the entries in the ESS system were false, no one from Kodak would contact those customers, resulting in the potential loss revenue and business for Kodak. Moreover, making false entries was in violation of Kodak

policy and warranted immediate termination. Gage and Broderick intended to ask White about the discrepancies in the June 22, 2006, follow-up meeting, but the meeting was canceled because Broderick had a death in his family. However, the meeting was rescheduled for the next week.

On Friday, June 23, 2006, White sent Gage an email in which he claimed he had made "some 60 or so phone calls" in the past week from the 91 Day Report. (Gage Aff., Ex. J.) Then, the following Monday, White unexpectedly went out on medical disability leave and did not return to work until August 17, 2006.

During White's absence, Gage continued her investigation. She looked at the ESS system for June 16, 2006, and found 62 of White's entries for that day. She printed out those screens and asked Kodak's IT department to run a report listing the times of those 62. The resulting report showed that most of the 62 entries had been made within a minute or two of each other. Gage concluded that it would not have been possible to make actual phone calls to customers in the short period of time between each entry and still obtain the information required for the ESS system. Since it was not possible to identify calls made specifically from White's telephone, Gage arranged for Kodak's phone provider, Nortel, to print out records showing any calls placed from the Kodak Office M1 telephone switch, which included White's phone, for June 2006. Gage reviewed the Nortel report, and assumed that *any* call made to a customer phone number from the Kodak Office M1 switch could have come from White's phone. With that assumption, she determined that 41 of the 62 ESS system entries White made on June 16, 2006, were false. No such calls were made from the Kodak Office M1 Switch during the entire month of June 2006.

Gage reported her findings to Broderick and Wainwright and they could not think of any possible excuse for her findings, other than falsification. After Broderick and Wainwright discussed the matter with higher Kodak management, Kodak made the decision to terminate White.

On August 17, 2006, when White returned to work, he was informed by Wainwright and Broderick of Kodak's decision to terminate him. White filed an appeal with Kodak's internal Resolution Support Services ("RSS") and had a hearing before a panel, which upheld the termination decision. At a separate unemployment insurance hearing involving White, Gage testified and detailed her investigation for Administrative Law Judge ("ALJ") Allan Hymes. In April 2007, ALJ Hymes denied White's unemployment insurance claim and, in in June 2007, the Unemployment Insurance Appeals Board upheld his ruling.

On July 5, 2006, White filed his second EEOC complaint alleging retaliation and hostile workplace. (Blankopf Aff., Ex. C, at Ex. 49.) He claimed in the complaint that since filing his first EEOC charge, he had been subjected to increasingly retaliatory actions and harassment. He cited to being counseled for phone call abuse, Internet abuse, inappropriate breaks and abusing lunch breaks. On February 8, 2007, the EEOC closed its file, administratively dismissing the charge and issuing a second right to sue letter. (Blankopf Aff., Ex. C., at Ex. 51.)

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interroga-tories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in

favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well–settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d

Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### Civil Rights Statutes

White asserts retaliation claims under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Title VII states, in pertinent part,

> It shall be an unlawful employment practice for an employer — to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e et seq. The Second Circuit has held that Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993). "To establish a prima facie case of retaliation, an employee must show '[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995)); *Terry v. Ashcroft*, 336 F.3d 128, 140–41 (2d Cir. 2003).

Section 1981 provides in relevant part as follows:

§ 1981. Equal rights under the law

(a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment,

pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.[4]

(c) Protection against impairment. The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (1991). "The gravamen of a retaliation claim under § 1981 is the allegation of discriminatory treatment because of the filing of a discrimination charge, as distinct from discriminatory treatment on account of race or color in the first instance." *Choudhury v. Polytechnic Institute of New York*, 735 F.2d 38, 44 (2d Cir.1984).

### McDonnell Douglas Analysis

Retaliation claims[5] are governed by the three-part analytical framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973). *Terry v. Ashcroft*, 336 F.3d 128, 140–41 (2d Cir. 2003); *see also Klausner v. Industrial Risk Insurers, Inc.*, No. 98 Civ. 1267 (RPP), 1999 U.S. Dist. LEXIS 10219, 1999 WL 476285, at *3 (S.D.N.Y. July 8, 1999) (applying *McDonnell Douglas* to N.Y. Human Rights Law

---

[4]This 1991 revision of § 1981 overruled the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), which limited the application of § 1981(a) in the post-contract time period (*e.g.*, § 1981 could not be used for claims that an employer fired an employee in retaliation). *See Richmond v. Board of Regents of University of Minnesota*, 957 F.2d 595, 597 (8th Cir. 1992).

[5]"New York state courts have adopted the above analysis for discrimination actions arising under the New York State Human Rights Law. *See, e.g., Matter of Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 939 (1985); *O'Connor v. Frawley*, 573 N.Y.S.2d 675, 676 (1st Dep't 1991); *Ioele v. Alden Press, Inc.*, 145 A.D.2d 29, 35 (1st Dep't 1989)." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992).

claim). Under the *McDonnell Douglas* standard, a plaintiff bears the burden of proof and must ultimately establish, by a preponderance of the evidence: (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). To establish that the adverse employment action occurred under circumstances giving rise to an inference of discrimination, a plaintiff may demonstrate that "similarly situated" employees who do not share the plaintiff's protected characteristics were treated preferentially. *Id*.

Requirements for establishing a prima facie case are minimal. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998). If a plaintiff is successful in demonstrating a prima facie case, then the burden shifts to his employer to articulate a legitimate, non-discriminatory purpose for its adverse employment action. *Id*. at 153. The Second Circuit has held that "[a]ny such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin*, 149 F.3d at 153.

Once the employer satisfies its burden, a plaintiff may prevail only if he presents evidence that the employer's proffered reasons are a pretext for discrimination. *Id*. To demonstrate pretext, a plaintiff must show both that the proffered reason was false and that discrimination was the real reason. *Id*. In a case where the Supreme Court applied the *McDonnell Douglas* criteria to an Age Discrimination in Employment Act claim, the Court held that a plaintiff's prima facie case, combined with sufficient evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation for its decision, may be

adequate to sustain a finding of liability for intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). Justice O'Connor, writing for a unanimous Court, said, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*.; *see also Regional Economic Community Action Program, Inc. v. United States*, 294 F.3d 35, 49 (2d Cir. 2002). "For the purposes of defeating the defendants' motion for summary judgment, the plaintiff need only raise a material factual issue as to whether the defendants' reason for firing the plaintiff constituted a pretext." *Visco v. Community Health Plan*, 957 F. Supp. 381, 388 (N.D.N.Y. 1997).

Following the Supreme Court's decision in *Reeves*, the Second Circuit decided *Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000). In *Schnabel*, the Second Circuit determined that *Reeves* had not eliminated the possibility of summary judgment for a defendant in discrimination cases when a plaintiff had proven a prima facie case and offered evidence that the employer's proffered reason was false. Quoting from *Reeves*, the Second Circuit explained that,

> In examining the impact of *Reeves* on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that an ADEA[6] claimant offer more than a prima facie case and evidence of pretext. . . . But the converse is not true; following *Reeves*, we decline to hold that no ADEA defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in

---

[6]Though *Reeves* and *Schnabel* involve the Age Discrimination in Employment Act, the cases analyze the same *McDonnell Douglas* factors applied in retaliation claims, such as the one at bar. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (ADEA claims analyzed under same framework as any other Title VII claim); *Gonzalez v. New York City Transit Authority*, No. 00 CIV. 4293 SHSAJP, 2001 WL 492448 (S.D.N.Y. May 9, 2001) (applying *Schnabel* to racial discrimination case).

Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted); *see also Vadie v. Mississippi State Univ.*, 218 F.3d 365, 374 n. 23 (5th Cir. 2000) (concluding after *Reeves* that a prima facie case plus pretext evidence may be enough to permit a finding of discrimination, but will not always be sufficient, with the ultimate issue remaining whether the evidence in the record as a whole "creates a reasonable inference that age was a determinative factor in the actions of which plaintiff complains"). Accordingly, summary judgment might still be appropriate in this matter.

*Schnabel*, 232 F.3d at 90–91.

## ANALYSIS

On Monday, June 26, 2006, White's supervisors were going to address the discrepancies Gage found while investigating White's work entries in the ESS system. However, White went on medical leave on June 26, and did not return until August 17, 2006. Meanwhile, on July 2, 2006, he filed his second EEOC charge alleging retaliation. In early August, while White was still on leave, Kodak management made the decision to terminate him, and executed that decision upon White's return on August 17. White has shown that he participated in a protected activity known to Kodak (filing his first EEOC complaint) and that he suffered an adverse employment action (he was terminated). The parties dispute whether White has shown a causal connection between his termination and his protected activity.

### *November 2005 protected activity*

White filed his first EEOC complaint on November 15, 2005. His termination took place on August 17, 2006, over nine months later. White emphasizes that his termination

took place within 43 days after he filed his retaliation claim with EEOC and only 28 days after his receipt of a right to sue letter based on his first complaint. (White Mem. of Law, at 6.)

The Court agrees that White cannot make out a prima facie case of retaliation based on Kodak's actions taken nine months after the first EEOC complaint. *Simpson v. New York State Dept. Of Civil Services*, 165 Fed. Appx. 500, 502 (2d Cir. Jan 9, 2006); *Bennett v. Verizon Wireless*, No. 04-CV-6314, 2008 U.S. Dist. LEXIS 5373, *10 (W.D.N.Y. Jan. 24, 2008). Filing his EEOC charge in November 2005 was a protected activity. However, the long lapse of time between that protected activity and the date of his termination fails to show a causal connection between the two. He has not offered direct evidence of retaliatory animus, nor has he identified any similarly-situated employees who were treated differently. *See De Cintio v. Westchester Cty. Med Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) ("Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment…, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct."). At best, the time separation is six months between his filing the first EEOC charge and the commencement of Gage's investigation. The Court determines that in the absence of any other evidence, this is simply too long a period of time to show temporal proximity. Accordingly, White has not made out a prima facie case based on the protected activity of November 2005.

### July 2006 protected activity

In responding to Kodak's motion for summary judgment, White claims, for the first time, that Kodak retaliated against him because he filed a second EEOC charge, or

because EEOC issued him a right to sue letter. Kodak counters:

> At no time during discovery, and at no time prior to his filing his opposition to defendant's motion, did plaintiff or his counsel allege that Kodak had instead retaliated against plaintiff because he filed a second EEOC charge in July 2006 or because the EEOC had issued him a Right to Sue letter for his first charge on July 20, 2006. These completely new allegations are raised for the first time in his opposition papers to Kodak's motion. Defendant respectfully submits that, in addition to their being deficient as a matter of law for other reasons as stated in the accompanying Reply Memorandum, these new allegations also warrant dismissal because they are outside the scope of his First Amended Complaint.

(Blankopf Reply Aff. ¶ 12; *see* Am. Compl. ¶¶ 14-16, 23-25, 32-34 (alleging retaliation only in response to his November 2005 EEOC complaint).) This claim must fail.

First, where, as here, discipline was already underway prior to the protected activity, which, in this situation, would be the July EEOC charge and right to sue letter, the Second Circuit has held that temporal proximity alone is insufficient to make out a prima facie case:

> But in this case the adverse employment actions were both part, and the ultimate product, of "an extensive period of progressive discipline" which began when Swiss Re diminished Slattery's job responsibilities a full *five months prior* to his filing of the EEOC charges. Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.

*Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), *cert. den.* 534 U.S. 951 (2001) (emphasis in original). On June 13, 2006, Kodak issued a performance memorandum to White and on June 19, 2006, Gage began her investigation of White's allegedly suspicious entries in preparation for the June 22, 2006, performance follow-up. (Wainright Aff. ¶ 12). The natural consequence upon learning that White had made false entries would be termination. (Wainright Aff. ¶ 25 ("Falsification of company records is a

serious violation of Kodak values. It destroys the integrity and reliability of the data found in company records. As a result of Mr. White's false entries in particular, the customer accounts for which he had entered false information had automatically dropped off the backlog of accounts in the reports for his districts. As a result, the customer would not be contacted by any Kodak representative to seek their business. This would potentially result in lost revenue and business for Kodak."). White filed his second EEOC charge on July 5, 2006, sixteen days after Gage had begun her investigation. He went out on medical leave beginning on June 26, 2006, and returned August 17, 2006, when he was terminated. (Wainright ¶ 22.) As in *Slattery*, however, the temporal proximity between White's second EEOC complaint and his termination, does not establish that he was terminated because of discrimination.

Nevertheless, even if White had made out a prima facie case of retaliation, Kodak has come forward with a nondiscriminatory reason for White's termination and White has not shown either that the proffered reason was false and that discrimination was the real reason. White disputes that he falsified records and spends a significant portion of his Local Rule 56.1 counter-statement of facts discussing how he "detached" his records from Kodak's database, worked from a spreadsheet, then assigned reason codes after he made his phone calls to customers. (White Rule 56 Counter-Statement, ¶¶ 163-69.) However, he does not address Kodak's charge that he falsely claimed to have contacted customers when the phone records clearly showed he had not. As Kodak points out, "plaintiff has not addressed or denied the one fact that caused his termination: he went into Kodak's records system and entered data indicating he had called and/or spoken to numerous Kodak customers even though he had not made any such calls." (Kodak Reply Mem. of Law, at

7.) White does not present evidence disputing Wainright's affidavit that, "Over the past few years, several employees have been subject to immediate termination because they falsified company data. This includes an employee who falsified data in an experimental record, and employees who falsified their timecards by putting down time worked that Kodak security records indicated they had not worked. Based on my review of Kodak records, I am not aware of any incident occurring in SMO itself where an employee was found to have falsified data or other records, other than Mr. White's actions." (Wainright Aff. ¶ 32.) In his unemployment insurance hearing testimony, White admitted that he made false entries into Kodak's database:

> Q. I understand. So it's your testimony that any entries made on June 16th or any of the other dates included in Exhibit G that just said not using, no opportunity would have been made without you having made a phone call because it was your practice to make those phone calls at a later date and than follow up and complete the entry?
>
> A. That's correct.

Day 2 hearing transcript, *In re: Phillip White*, No. 307-01944 (N.Y.S. Dep't of Labor, Unemployment Insurance, Appeal Board No. 537271, Apr. 24, 2007), at 111-12 (attached to Blankopf Aff., as Ex. E). White's argument that Kodak's Nortel phone records did not isolate his phone extension, and that Kodak would not have known the updated phone numbers, is disingenuous as shown by Gage's affidavit:

> 77. I also was present when Mr. White testified at his unemployment insurance hearing that, in the few business days between his making these false entries on June 16, 2006 and his departure on medical leave after June 23, 2006, he belatedly made the telephone calls to those customers. He also claimed that some of the telephone numbers in the ESS system were not correct so he had to find and call different numbers.

78. The records I gathered prove that this claim is not true. I arranged for Nortel to produce telephone records for the full month of June 2006, not merely through June 16th. Any calls that Mr. White made between June 16th and June 23 necessarily would have been reflected in Nortel's telephone records. Yet they were not there.

79. For Mr. White to have determined that our records had a wrong telephone number, he necessarily would have placed a call to that wrong number first in order to have learned that the number was wrong. His telephone call to the original number would still have been reflected in Nortel telephone records. Again, they were not. The records I gathered disprove all of Mr. White's unbelievable excuses for his misconduct.

(Gage Aff. ¶¶ 77-79.)

## CONCLUSION

White has failed to meet his burden of showing a prima facie case of discrimination since he failed to show a causal relationship between his protected activity and his termination. Moreover, even if he had met that de minimus burden, the Court would have found that he did not show that Kodak's reason for terminating him was false and that the real reason was discrimination. Accordingly, the Court grants Kodak's motion (Docket No. 36) for summary judgment. The Clerk is directed to enter judgment for Kodak and close the case.

IT IS SO ORDERED.

Dated:  May 29, 2009
        Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge